Slip Op. 19-119

**UNITED STATES COURT OF INTERNATIONAL TRADE**

<table>
<tr><td>

VALEO NORTH AMERICA, INC.,

       Plaintiff,

  and

PROAMPAC INTERMEDIATE, INC.,
AMPAC HOLDINGS, LLC, JEN-COAT,
INC., MAHLE BEHR TROY INC., MAHLE
BEHR USA INC., MAHLE BEHR DAYTON
L.L.C., MAHLE BEHR CHARLESTON INC.,
MAHLE BEHR MANUFACTURING
MANAGEMENT, INC., AND MAHLE
MANUFACTURING MANAGEMENT, INC.,

       Plaintiff-Intervenors,

  v.

UNITED STATES,

       Defendant,

  and

ALUMINUM ASSOCIATION TRADE
ENFORCEMENT WORKING GROUP AND
ITS INDIVIDUAL MEMBERS, JW
ALUMINUM COMPANY, NOVELIS
CORPORATION, AND REYNOLDS
CONSUMER PRODUCTS LLC,

       Defendant-Intervenors.

</td><td>

Before: Mark A. Barnett, Judge
Consol. Court No. 18-00087


**PUBLIC VERSION**

</td></tr>
</table>

<u>**OPINION**</u>

[Denying Plaintiffs' motions for judgment on the agency record.  The U.S. International Trade Commission's finding of a single domestic like product, inclusive of ultra-thin gauge aluminum foil and certain fin stock, is supported by substantial evidence and in accordance with law.]

Dated: September 9, 2019

<u>Daniel Cannistra</u>, <u>Robert L. LaFrankie</u>, and <u>Alexander H. Schaefer</u>, Crowell & Moring, LLP, of Washington, DC, for Plaintiff Valeo North America, Inc.

<u>Mark R. Ludwikowski</u> and <u>R. Kevin Williams</u>, Clark Hill PLC, of Washington, DC, for Plaintiff-Intervenors ProAmpac Intermediate, Inc., Ampac Holdings, LLC, Jen-Coat, Inc., MAHLE Behr Troy Inc., MAHLE Behr USA Inc., MAHLE Behr Dayton L.L.C., MAHLE Behr Charleston Inc., MAHLE Behr Manufacturing Management, Inc., and MAHLE Manufacturing Management, Inc.

<u>Benjamin L. Allen</u>, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, for Defendant United States.  With him on the brief were <u>Dominic L. Bianchi</u>, General Counsel, and <u>Andrea C. Casson</u>, Assistant General Counsel for Litigation.

<u>John M. Herrmann</u>, <u>Paul C. Rosenthal</u>, <u>Kathleen W. Cannon</u>, <u>Grace W. Kim</u>, and <u>Joshua R. Morey</u>, Kelley Drye & Warren, LLP, of Washington, DC, for Defendant-Intervenors Aluminum Association Trade Enforcement Working Group and its Individual Members, JW Aluminum Company, Novelis Corporation, and Reynolds Consumer Products LLC.

Barnett, Judge:  This consolidated action is before the court on three motions for judgment on the agency record challenging the United States International Trade Commission's ("ITC" or "the Commission") domestic like product determination in the antidumping and countervailing duty investigations of aluminum foil from the People's Republic of China ("China").  *See Aluminum Foil From China*, 83 Fed. Reg. 16,128 (ITC Apr. 13, 2018) (final determinations) ("*Final Determinations*"),[1] PR 240, CJA Tab 42.

---

[1] Defendant filed the confidential administrative record ("CR") at ECF No. 32, and the public administrative record ("PR") at ECF Nos. 33, 76.  The parties also submitted joint appendices containing record documents cited in their briefs.  *See* Public J.A., ECF No. 92; Confidential J.A. ("CJA"), ECF No. 91; Public Suppl. J.A., ECF No. 95; Confidential Suppl. J.A. ("CSJA"), ECF No. 94.  The Commission's staff report and views are

Specifically, Plaintiff, Valeo North America Inc. ("Valeo"), and Plaintiff-Intervenors—

MAHLE Behr Troy Inc. ("MAHLE BT"), MAHLE Behr USA Inc., MAHLE Behr Dayton

L.L.C., MAHLE Behr Charleston Inc., MAHLE Behr Manufacturing Management, Inc.,

and MAHLE Manufacturing Management, Inc. (collectively, "MAHLE")—challenge the

ITC's inclusion of certain fin stock in the domestic like product as unsupported by

substantial evidence and not in accordance with law.  *See* Confidential Pl.'s 56.2 Mot.

for J. on the Agency R. and Mem. of Law in Supp. of Pl.'s Confidential Rule 56.2 Mot.

for J. Upon the Agency R. ("Valeo Mem."), ECF No. 74; Pl.-Ints.' Rule 56.2 Mot. for J.

on the Agency R., and Pl.-Ints. MAHLE Behr Charleston Inc., MAHLE Behr Dayton

L.L.C., MAHLE Behr Manufacturing Management, Inc., MAHLE Behr Troy Inc., MAHLE

Behr USA Inc., MAHLE Manufacturing Management, Inc.'s Rule 56.2 Mem. of Law in

Supp. of Mot. for J. on the Agency R. ("MAHLE Mem."), ECF No. 69.  Plaintiff-

Intervenors—ProAmpac Intermediate, Inc., Ampac Holdings, LLC, and Jen-Coat, Inc.,

doing business as Prolamina (collectively, "ProAmpac")—challenge the ITC's inclusion

of ultra-thin gauge aluminum foil in the domestic like product as unsupported by

substantial evidence and not in accordance with law.  *See* Pl.-Ints.' Rule 56.2 Mot. for J.

---

contained in the following publications filed in the administrative record: Aluminum Foil
from China (Apr. 2018), Inv. Nos. 701-TA-570 and 731-TA-1346, USITC Pub. 4771
(Apr. 2018) (Final) PR 239, CJA Tab 41, ECF No. 33, and its corresponding confidential
versions, Confidential Views of the Commission ("Final Views") and Confidential Staff
Report (Final) (Mar. 6, 2018) ("Final Staff Report"), ECF No. 32.  The court references
the confidential versions of the record documents and the ITC determinations, unless
otherwise specified.

on the Agency R. and Mem. of Law in Supp. of Pls.' Rule 56.2 Mot. for J. on the Agency

R. ("ProAmpac Mem."), ECF No. 67.

Defendant, United States ("the Government"), and Defendant-Intervenors, the

Aluminum Association Trade Enforcement Working Group and its individual members

(collectively, the "Aluminum Association"),[2] support the Commission's determinations.

*See* Def. United States' Confidential Mem. in Opp'n to Pls.' Mots. for J. on the Agency

R. ("Gov. Resp."), ECF No. 78; Aluminum Ass'n Resp.  For the reasons discussed

below, Valeo's, MAHLE's, and ProAmpac's motions are denied.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[3] and 28 U.S.C. § 1581(c)

(2012).  The ITC's factual determinations are "presumed to be correct," and "[t]he

burden of proving otherwise . . . rest[s] upon the party challenging such decision."  28

U.S.C. § 2639(a)(1).  The court will uphold an ITC determination that is supported by

substantial evidence and otherwise in accordance with law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp.*

*(30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co.*

---

[2] The Aluminum Association's members are JW Aluminum Company, Novelis
Corporation ("Novelis"), and Reynolds Consumer Products, LLC.  Confidential Def.-Ints.'
Resp. Br. ("Aluminum Ass'n Resp.") at 1, ECF No. 77.
[3] Further citations to the Tariff Act of 1930, as amended are to the relevant portions of
Title 19 of the U.S. Code, 2012 edition.

*v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Changzhou Trina Solar Energy Co., Ltd.*

*v. U.S. Int'l Trade Comm'n.*, 879 F.3d 1377, 1380 (Fed. Cir. 2018).  It "requires more

than a mere scintilla," but "less than the weight of the evidence."  *Nucor Corp. v. United*

*States*, 34 CIT 70, 72, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United*

*States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).

BACKGROUND

## I.    Legal Framework

The U.S. Department of Commerce ("Commerce") and the ITC have distinct

functions in antidumping and countervailing duty proceedings.  *See Ad Hoc Shrimp*

*Trade Action Comm. v. United States,* 515 F.3d 1372, 1375 (Fed. Cir. 2008).

"Commerce determines whether foreign imports into the United States are either being

dumped or subsidized (or both)," and the ITC "determine[s] whether these dumped or

subsidized imports are causing material injury to a domestic industry in the United

States."  *Changzhou Trina Solar Energy Co., Ltd. v. U.S. Int'l Trade Comm'n*, 39

CIT___, ___, 100 F. Supp. 3d 1314, 1319 (2015) (citation omitted); *see also* 19 U.S.C.

§§ 1671, 1673.  Accordingly, "Commerce determines the scope of [an] investigation,"

establishing the class or kind of foreign merchandise that would be subject to any

resulting antidumping or countervailing duty order, *Cleo Inc. v. United States*, 30 CIT

1380, 1382 (2006), *aff'd*, 501 F.3d 1291 (Fed. Cir. 2007), while the Commission

"identif[ies] the corresponding universe of items produced in the United States [by the

affected industry] that are like, or in the absence of like, most similar in characteristics

and uses with the items in the scope of the investigation," *Changzhou Trina Solar*, 100

F. Supp. 3d at 1319 (citing 19 U.S.C. §§ 1673(i), 1671(a)) (additional citation and

quotation and formatting marks omitted).[4]  Although the scope of an investigation "is

necessarily the starting point of the Commission's like product analysis," *Cleo Inc. v.*

*United States*, 501 F.3d 1291, 1298 n.1 (Fed. Cir. 2007) (citing 19 U.S.C. § 1677(10)),

the scope "does not control the Commission's determination," *id.*; *see also Hosiden*

*Corp. v. Advanced Display Mfrs. of Am.*, 85 F.3d 1561, 1567 (Fed. Cir. 1996) (citation

omitted).

The domestic like product determination is a fact-specific inquiry pursuant to

which the Commission weighs "six factors relating to the products in question: (1)

physical characteristics and uses; (2) common manufacturing facilities and production

employees; (3) interchangeability; (4) customer perceptions; (5) channels of distribution;

and, where appropriate, (6) price." *Cleo*, 501 F.3d at 1295.  "When weighing those

factors, the Commission disregards minor differences and focuses on whether there are

any clear dividing lines between the products being examined."  *Id.*

## II.    Factual and Procedural History

On March 6, 2017, the Aluminum Association, domestic producers of aluminum

foil, filed antidumping and countervailing duty petitions with Commerce and the ITC

regarding imports of aluminum foil from China.  *See* Petitions for Imposition of

Antidumping and Countervailing Duties (Mar. 9, 2017)*,* CR 1, PR 1, CJA Tab 1.  The

---

[4] "The term 'domestic like product' means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an [antidumping or countervailing duty] investigation."  19 U.S.C. § 1677(10).

petitions covered aluminum foil with a thickness of 0.2 millimeters ("mm") or less,[5] in

reels exceeding 25 pounds, regardless of width.  *Id.* at 6–7.  The petitions listed a range

of uses for aluminum foil, including its use in the "manufacture [of] thermal insulation for

the construction industry, fin stock for air conditioners, electrical coils for transformers,

capacitors for radios and televisions, and insulation for storage tanks."  *Id.* at 7.

On March 15, 2017, the ITC instituted antidumping ("AD") and countervailing duty

("CVD") investigations of aluminum foil imports from China.  *See Aluminum Foil From*

*China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling*

*of Preliminary Phase Investigations*, 82 Fed. Reg. 13,853 (Mar. 15, 2017), PR 7, CJA

Tab 2.  During the preliminary phase of the investigations, several parties raised

arguments as to the appropriate definition(s) of the domestic like product(s).

Specifically, Valeo and MAHLE BT claimed that fin stock, "defined as flat-rolled

aluminum of 45 microns ([0.045 mm or] 0.00177 inches) or more in thickness,

containing 1 percent or more, by weight, of manganese" was a separate domestic like

product.  Post-Conference Br. (Apr. 4, 2017) ("Valeo & MAHLE BT Postconf. Br.") at 1,

CR 100, PR 79, CJA Tab 6.  Other parties urged the ITC to treat ultra-thin gauge

aluminum foil, less than eight microns (0.008 mm or 0.0003 inches) thick, as a separate

domestic like product.  *See* Confidential Views of the Commission (Prelim.) (May 2,

2017) ("Prelim. Views") at 9 & n.24, CR 135, CJA Tab 10B, CSJA Tab 45 (citations

---

[5] In other words, 200 micrometers ("microns") or 0.00787 inches.  Microns "represent
one thousandth of a millimeter, or one millionth of a meter."  Final Staff Report at I-16
n.39.

omitted); *see also* Bracket Corrections to the Apr. 4, 2017 Post-Conference Br. of the

Flexible Packaging Ass'n et. al. (Apr. 5, 2017) ("FPA Postconf. Br"), CR 99, PR 88, CJA

Tab 5.

On April 28, 2017, the ITC issued its affirmative preliminary determinations

finding a "reasonable indication that an industry in the United States is materially injured

by reason of the imports of aluminum foil from China . . . ." *Aluminum Foil From China*,

82 Fed. Reg. 19,751, 19,751 (ITC Apr. 28, 2017) (prelim. determinations), PR 129, CJA

Tab 9; *see also* Prelim. Views at 46.  The Commission preliminarily found "a single

domestic like product consisting of all aluminum foil coextensive with the scope of the

investigations."  Prelim. Views at 10.  The scope included: "[A]luminum foil having a

thickness of 0.2 mm [(200 microns; 0.00787 inches)] or less, in reels exceeding 25

pounds, regardless of width . . . made from an aluminum alloy that contains more than

92 percent aluminum."  *Id.* at 8.  While the ITC preliminarily determined that fin stock is

part of the single domestic like product, it acknowledged its intention to further examine

this issue and collect additional data regarding the domestic production of fin stock in

the final phase of the investigations.  *Id.* at 10, 18.  The ITC declined to classify ultra-

thin gauge aluminum foil as a separate domestic like product because the record did not

identify a clear dividing line separating it from the other aluminum foil products

described by the scope definition.  *Id.* at 15.

On September 28, 2017, the ITC invited interested parties to comment on draft

questionnaires to be issued to producers, importers, and purchasers in the final phase

of the investigations.  *See* Letter from Michael G. Anderson, Director, U.S. Int'l Trade

Comm'n to Counsel (Sept. 28, 2017) ("Letter Re: Questionnaire Cmts."), PR 277, CJA

Tab 12; U.S. Producers' Questionnaire ("Draft Questionnaire"), PR 278, CJA Tab 13.  In

the draft questionnaire to U.S. producers, the Commission defined "[i]n scope fin stock

aluminum foil" consistent with Valeo's proposed definition as "flat-rolled aluminum of

greater than or equal to 45 microns (0.045 mm; 0.00177 inches) and less than or equal

to 200 microns (0.2 mm, 0.00787 inches) in thickness, containing 1 percent or more, by

weight, of manganese."  Draft Questionnaire at 2; *see also* Valeo & MAHLE BT

Postconf. Br. at 1.  Valeo and MAHLE BT recommended changing "in scope fin stock

aluminum foil" to "fin stock," but did not otherwise recommend any changes to the

definition.  *See* Valeo's Draft Questionnaire Comments (Oct. 13, 2017) ("Valeo's Draft

Questionnaire Cmts.") at 3, PR 152, CJA Tab 14; MAHLE Behr Troy Inc. Comments on

Draft Questionnaires (Oct. 13, 2017) at 4, PR 155, CJA Tab 15.  In contrast, the

Aluminum Association asserted that the proposed definition for "in scope fin stock

aluminum foil" did not encompass all the different aluminum foil products used in fin

stock applications.  Domestic Indus. Comments on Draft Questionnaires for Final Phase

Investigations (Oct. 13, 2017) ("Aluminum Ass'n Draft Questionnaire Cmts.") at 2–3, PR

156, CJA Tab 16.  It proposed revising the definition to exclude any reference to

manganese content (so as to not exclude various alloy series) and to reduce the

minimum thickness to 35 microns (0.035 mm or 0.001378 inches).  *Id.* at 3.

Subsequently, the Commission issued its final questionnaires, in which it

addressed the parties' comments by requesting from U.S. producers information for

"certain fin stock"[6] and "other in-scope fin stock"[7] aluminum foil, among other aluminum

foil products.  *See* U.S. Producers' Questionnaire at 2.[8]  Six domestic producers of

aluminum foil, which collectively "accounted for the vast majority of domestic

production," responded to the Commission's U.S. Producers' Questionnaire.  Final

Views at 4; Final Staff Report at I-5.

On January 25, 2018, the Commission issued its prehearing staff report.  *See*

Prehearing Report (Jan. 25, 2018), PR 282, CJA Tab 21.  Thereafter, the parties filed

their prehearing briefs.  *See* Prehr'g Br. (Feb. 1, 2018) ("Valeo Prehr'g Br."), CR 287,

289, PR 196, CJA Tab 22; Prehr'g Br. of ProAmpac Intermediate, Inc., Ampac Holdings,

LLC, and Jen-Coat, Inc., d.b.a. Prolamina (Feb. 1, 2018), CR 287, 295, PR 199, CJA

Tab 24; Pet'rs' Prehr'g Br. (Feb. 1, 2018) ("Aluminum Ass'n Prehr'g Br."), CR 290, 294,

PR 198, CJA Tab 23.  In its prehearing brief, Valeo revised its proposed definition of fin

stock to add to that definition that the aluminum "meet[s] the specification for fin stock

---

[6] The ITC defined "certain fin stock" in conformity with Valeo and MAHLE BT's proposed definition "as flat-rolled aluminum of greater than or equal to 45 microns (0.045 mm; 0.00177 inches) and less than or equal to 200 microns (0.2 mm, 0.00787 inches) in thickness, containing 1 percent or more, by weight, of manganese."  U.S. Producers' Questionnaire (undated) ("U.S. Producers' Questionnaire") at 2, PR 162, CJA Tab 18; *see also* Valeo & MAHLE BT Postconf. Br. at 1; Valeo's Draft Questionnaire Cmts. at 2.
[7] Consistent with the Aluminum Association's recommendations, the ITC defined "other in-scope stock" to include: "Any other types of fin stock your firm sells to U.S. customers that meets the definition of 'aluminum foil' but not 'certain fin stock' (e.g., fin stock made from 1000 and 7000 series alloys)."  U.S. Producers' Questionnaire at 2; *see also* Aluminum Ass'n Draft Questionnaire Cmts. at 3.
[8] Among other information, the Commission requested data regarding production, sales, and channels of distribution, specific to fin stock based on the supplied definitions.  *See* U.S Producers' Questionnaire at 44–53.

as defined by the Aluminum Association."[9]  Valeo Prehr'g Br. at 5.  Valeo subsequently

revised its proposed definition of fin stock again and requested that the Commission

define it as "[c]oiled sheet or foil suitable and intended for the manufacture of fins for

heat-exchanger applications and in accordance with the chemical, mechanical and

tolerance specifications provided for by the Aluminum Association for fin stock."

Posthr'g Br. (Feb. 15, 2018) ("Valeo Posthr'g Br.") at 2, CR 322, PR 214, CJA Tab 28.

On April 13, 2018, the ITC published its final affirmative determinations.  *See*

*Final Determinations*, 83 Fed. Reg. 16,128.  The Commission defined a single domestic

like product inclusive of ultra-thin gauge aluminum foil and "certain fin stock."  Final

Views at 15, 22.  The Commission stated that Valeo had "vacillated about how to frame

its request for a separate domestic like product concerning fin stock, proposing three

different domestic like product definitions over the course of the final phase of these

investigations, each more broad than the last."  *Id.* at 16.  The Commission explained

that it based its analysis on the definition that Valeo proposed in its comments on the

draft questionnaires—which definition the Commission incorporated into the final

questionnaires—and the data collected in response to the questionnaires.  *Id.*

After comparing certain fin stock to other aluminum foil products pursuant to its

six-factor test, the ITC rejected Valeo's argument that certain fin stock constituted a

---

[9] Thus, in full, Valeo's new proposed definition was: "Fin stock . . . is defined as flat-rolled aluminum of 45 microns (0.00177 inches) or more in thickness, containing 1 percent or more, by weight, of manganese and meeting the specifications for fin stock as defined by the Aluminum Association."  Valeo Prehr'g Br. at 5.

separate like product. [10]  *See id.* at 15–22.  The Commission explained that when, as

here:

> [the] domestically manufactured merchandise is made up of a grouping of
> similar products or involves niche products, the Commission does not
> consider each item of merchandise to be a separate like product that is
> only "like" its identical counterpart in the scope, but considers the grouping
> itself to constitute the domestic like product and "disregards minor
> variations," absent a "clear dividing line" between particular products in the
> group.

*Id.* at 20 (footnote citations omitted).

The Commission determined that the evidence developed in the final phase of

the investigations did not warrant modifications to the Commission's preliminary finding

that there was no clear dividing line between ultra-thin gauge aluminum foil and other

foil products described in the scope definition.  *Id.* at 14.

On April 23, 2018, Valeo commenced this action challenging the Commission's

like product determination.  Summons, ECF No. 1.  ProAmpac initiated a separate

action likewise challenging the Commission's like product determination.  *See*

*ProAmpac Intermediate, Inc. et al v. United States*, No. 18-cv-00105 (Ct. Int'l Trade filed

May 11, 2018).  On July 12, 2018, the court consolidated that action under this lead

action.  Order (July 12, 2018), ECF No. 35.[11]

---

[10] In the administrative proceeding, MAHLE BT and MAHLE Behr USA Inc. incorporated
Valeo's arguments by reference.  *See* Final Views at 4 n.5.
[11] The consolidation order also included *Trinidad/Benham Corp. v. United States*, No.
18-cv-00115 (Ct. Int'l Trade filed May 18, 2018), which has been dismissed by
stipulation.  *See* Order (July 12, 2018), Docket Entry 35; Stip. of Partial Dismissal (July
25, 2018), ECF No. 62.

DISCUSSION

## I.   ProAmpac's Motion

ProAmpac avers that the ITC improperly defined a single domestic like product inclusive of ultra-thin gauge aluminum foil because the Commission failed to independently analyze this issue and instead "defined the domestic like product as coextensive with the scope of the investigation," and the Commission's like product determination is not supported by substantial evidence.  ProAmpac Mem. at 7–9.  Concerning its second claim, ProAmpac contends that differences in physical characteristics, production processes, interchangeability, and price establish that ultra-thin gauge aluminum foil is a separate like product.  *Id.* at 9.  The Government argues that the Commission's determination, which was based on an evaluation of the six factors, is supported by substantial evidence, and ProAmpac's claims amount to an impermissible attempt to reweigh the evidence.  *See* Gov. Resp. at 40–45.  The Aluminum Association contends that ProAmpac failed to develop, and therefore waived, its arguments, Aluminum Ass'n Resp. at 35–36, and ProAmpac's arguments are otherwise baseless, *id.* at 32–34.

### A.  Whether the Commission Properly Considered Whether Ultra-Thin Gauge Aluminum Foil is a Separate Domestic Like Product

As noted, the Commission analyzes six factors when it evaluates the domestic like product relative to the scope of an AD or CVD investigation.  *See Cleo Inc.*, 501 F.3d at 1295.  Consistent with this policy, the ITC considered these factors when it analyzed whether ultra-thin gauge aluminum foil is a separate domestic like product.

*See* Prelim. Views at 10–15 (conducting a like product analysis pursuant to the six-factor test); Final Views at 13–15 (reexamining its preliminary findings in light of the evidence developed in the final phase of the investigations).  Indeed, ProAmpac itself observes that "[t]he Commission considered these [six] factors in this case and found a single domestic like product encompassing all subject aluminum foil," ProAmpac Mem. at 8, thereby contradicting the premise of its own argument.  The Commission's analysis is not lessened by the fact that it led the Commission to find that the domestic like product is coextensive with the scope of these investigations.  Therefore, the court finds that the Commission independently analyzed whether ultra-thin gauge aluminum foil is a separate like product from other in-scope aluminum foil.

### B.  Whether the Commission's Determination is Supported by Substantial Evidence

ProAmpac asserts that "[t]he Commission's six-factor test clearly shows that ultra-thin aluminum foil is in fact a separate product.  The Commission erred in finding otherwise."  *Id.*  With no developed argumentation, ProAmpac recites four alleged differences between ultra-thin gauge aluminum foil and other in-scope aluminum foil that purport to establish "clear dividing lines" between the two products:

> Physical characteristics: Ultra-thin gauge foil is more formable while thicker gauges are more durable;

> Production processes: Ultra-thin gauge foil requires additional equipment and production steps;

> Interchangeability: Ultra-thin gauge foil and thicker foils are not interchangeable; and

> Price: The price of ultra-thin gauge foil is significantly higher than other

domestic foils.

*Id.* at 9 (footnote omitted).  Aside from generally citing to the Commission's preliminary

findings, *id.* at 9 & n.1 (citation omitted), ProAmpac fails to identify any record evidence

in support of its claims or explain why the Commission's determination is unsupported

by substantial evidence, *see id.* at 8–9.

In its reply, ProAmpac develops *some* of its opening brief arguments, *see*

Confidential Pl.-Ints.' Reply Br. in Supp. of Rule 56.2 Mot. For J. on the Agency R.

("ProAmpac Reply") at 5–6, ECF No. 81, but makes additional claims not previously

raised, *see id.* at 2–4 (arguing that the ITC failed to establish material injury "by reason

of" imports of ultra-thin gauge aluminum foil); *id.* at 6–7 (arguing the channels of

distribution factor).  "It is well established that arguments that are not appropriately

developed in a party's briefing may be deemed waived."  *United States v. Great Am.*

*Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013).  While the court will

consider arguments raised in ProAmpac's opening brief, to which the Government and

the Aluminum Association had an opportunity to, and did, respond, it will not consider

arguments raised for the first time in ProAmpac's reply.  *Cf. Fuji Photo Film Co. v. Jazz*

*Photo Corp.*, 394 F.3d 1368, 1375 n.4 (Fed. Cir. 2005) (declining to consider an

argument inappropriately raised in a footnote in an opening brief that was more fully

developed in a reply brief).  As discussed below, contrary to ProAmpac's claims,

substantial evidence supports the Commission's determination that ultra-thin gauge

aluminum foil is not a separate like product.

*Physical Characteristics and Uses*

ProAmpac's claim that ultra-thin gauge aluminum foil has different physical characteristics from other aluminum foil rests on its assertions that "the domestic industry recognizes 0.0003 [inches] as a globally-accepted cutoff within the industry" and that ultra-thin gauge aluminum foil has unique end uses.  ProAmpac Reply at 5. With respect to the latter, ProAmpac contends that ultra-thin gauge aluminum foil is utilized by the flexible packaging industry because of its flexibility and is not suited for household use because it "cannot maintain the durability of standard thicker foil."  *Id.* ProAmpac's claims are unpersuasive.

The Commission considered whether a thickness of 0.0003 inches or less represented a clear dividing line between ultra-thin gauge aluminum foil and other aluminum foil and, based on record evidence, found that it did not.  Prelim. Views at 10 & nn.29–30 (citing, *inter alia*, Pet'rs' Postconf. Br. (Apr. 4, 2017) ("Aluminum Ass'n Postconf. Br.") at 6–7 & Ex. 8, CR 102, 108, PR 87, CJA Tab 7, CSJA Tab 46).[12] Moreover, the Commission recognized that ultra-thin gauge aluminum foil is generally lighter and more flexible but noted that it generally has the same qualities as thicker gauge foil.  *Id.* at 11; *see also id.* at 14 (stating that ultra-thin gauge aluminum foil and thicker foils "share many of the same physical characteristics and properties").

---

[12] For example, [[

]] and "an aluminum foil distributor uses a demarcation line of 0.0004 to distinguish between 'thin' and standard foil."  Prelim. Views at 10; *see also* Aluminum Ass'n Postconf. Br. at 6–7.

Additionally, the Commission acknowledged that ultra-thin gauge aluminum foil tends to be primarily used in flexible packaging applications, *id.* at 11 & n.35 (citation omitted), but concluded that "varying uses are typical where a grouping of similar products is involved," *id.* at 14.[13]   The Commission's conclusion is supported by substantial evidence and otherwise reasonable.  *See Hitachi Metals, Ltd. v. United States*, 43 CIT ___, ___, 350 F. Supp. 3d 1325, 1345 (2018) (sustaining the ITC's finding that "specificity of end use may not carry much weight when, as here, the domestic like product is made up of a grouping of similar products or involves niche products, which serve a variety of purposes") (internal quotation marks and citation omitted).

ProAmpac does not discuss the evidence upon which the Commission relied, nor does it point to evidence that detracts from the Commission's findings.  ProAmpac's position reflects simple disagreement with the conclusions that the Commission drew from the available evidence; however, that is not a proper basis for the court to disturb the Commission's findings.  *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376–77 (Fed. Cir. 2015) (the court is not to reweigh the evidence).

### *Common Manufacturing Facilities and Production Employees*

ProAmpac's claim that ultra-thin gauge aluminum foil has different production processes from other aluminum foil rests on a passing notation in its reply brief that a Chinese manufacturer testified to using different equipment to make ultra-thin gauge foil.  *See* ProAmpac Reply at 6.  ProAmpac did not otherwise develop this argument.

---

[13] The Commission's preliminary findings with respect to ultra-thin gauge aluminum foil were largely undisturbed in its final determination.  *See* Final Views at 14.

The Commission considered this evidence and concluded that it was unclear whether

any additional processes and machinery were employed by other manufacturers or are

unique to this Chinese company's production model.  *See* Prelim. Views at 12 & n.39

(citing Tr. of ITC Staff Conference Hr'g (Mar. 30, 2017) at 122–23, PR 66, CJA Tab 4,

CSJA Tab 50 (testimony of Mr. Jack Morrison, former CEO of Xiashun Xiamen Holdings

Ltd.)).  Other record evidence indicated that the production process for ultra-thin gauge

aluminum foil involved the same equipment and employees as are involved in thicker

gauge foil.  *Id.* at 11.  "[W]hen adequate evidence exists on both sides of an issue,

assigning evidentiary weight falls exclusively within the authority of the Commission."

*Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1358 (Fed. Cir. 2006).  Based on

the Commission's reasoning and the evidence upon which it relied, *see* Prelim. Views at

11–22, the Commission's findings with respect to this factor are supported by

substantial evidence.

### Interchangeability and Price

ProAmpac alleges that interchangeability and price establish clear dividing lines

between ultra-thin gauge aluminum foil and other aluminum foil; however, it does not

challenge the Commission's findings with respect to these factors or explain how those

findings fail to support the Commission's conclusion.  *See* ProAmpac Mem. at 9;

ProAmpac Reply.  The Commission found limited interchangeability between ultra-thin

gauge aluminum foil and thicker foil but explained that "varying uses are typical whe[n] a

grouping of similar products is involved."  Final Views at 12–13, 14.  The Commission

determined that the price of ultra-thin gauge aluminum foil is higher than other

aluminum foil, *id*. at 13, but this factor alone did not establish a clear dividing line, *id*. at

13–15.  In addition to the factors addressed above, the Commission also found

similarities in channels of distribution and observed that a majority of domestic

producers and U.S. importers and purchasers "indicated that ultra-thin gauge aluminum

foil was mostly or somewhat comparable with all other aluminum foil with respect to

market perceptions."  *Id.* at 14 & nn. 50–51 (citing Staff Report Table I-8, Table I-7).

In sum, substantial evidence supports the Commission's conclusion that the

record evidence did not support finding a clear dividing line between ultra-thin gauge

aluminum foil and thicker foil products.  Accordingly, the court will not disturb the ITC's

determination on this issue.

## II.    Valeo's and MAHLE's Motions[14]

Valeo contends that the Commission's finding of a single domestic like product,

inclusive of certain fin stock, is contrary to law and unsupported by substantial evidence.

Valeo Mem. at 1, 8.  According to Valeo, the Commission's determination is contrary to

law because "the Commission failed to draw [an] adverse inference from [the] domestic

industr[y's] repeated refusal to provide accurate and reliable information."  *Id.* at 10

(capitalization omitted); *see also* Pl.'s Reply Br. in Supp. of 56.2 Mot. for J. on the

Agency R. ("Valeo Reply") at 3, ECF No. 84.  Valeo further contends that substantial

---

[14] As explained in MAHLE's moving brief and its letter submitted in lieu of a reply brief, it
has adopted Valeo's arguments by reference.  *See* MAHLE Mem. at 4; Letter in Lieu of
a Reply Brief in Supp. of Pl.'s and Int.-Pls.' Mot. for J. Upon Agency R. Pursuant to Rule
56.2 (May 6, 2019), ECF No. 83.  Therefore, the court's reference to Valeo's arguments
includes MAHLE's arguments.

evidence does not support the Commission's findings that certain fin stock and other aluminum foil share common physical characteristics; manufacturing facilities, production processes and employees; and distribution channels.  Valeo Mem. at 16–21. Additionally, Valeo argues that the Commission failed to evaluate conflicting information with respect to those findings, *id.* at 21–28, and failed to explain "how it applied the totality of circumstances test," *id.* at 28–29 (capitalization omitted).  The Government and the Aluminum Association support the Commission's findings and decisions on each issue.  *See* Gov. Resp. at 20–45; Aluminum Ass'n Resp. at 22–32.

### A.  Whether the Commission's Determination is in Accordance with Law

#### i.  *Legal Standard*

When "necessary information is not available on the record," or an interested party "withholds information" requested by the Commission," "fails to provide" requested information by the submission deadlines, "significantly impedes a proceeding," or provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i), the Commission "shall . . . use the facts otherwise available."  19 U.S.C. § 1677e(a).[15] Additionally, if the Commission determines that the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," it "may use an inference that is adverse to the interests of that party in selecting from among the facts

---

[15] The Commission's authority to use the facts otherwise available is subject to 19 U.S.C. § 1677m(c), (d), and (e).

otherwise available."[16]  *Id.* § 1677e(b).  The Commission's decision whether to use an

adverse inference is discretionary.  *See Timken U.S. Corp. v. United States*, 28 CIT 62,

84–85, 310 F. Supp. 2d 1327, 1346 (2004) ("Neither the statute's plain language nor its

legislative history obligates the Commission to make adverse inferences in any

situation.").  In fact, unlike Commerce, "which often draws adverse inferences against

particular non-cooperative companies when calculating dumping margins, . . . the

Commission rarely draws adverse inferences because its decisions affect all industry

participants."  *GEO Specialty Chems., Inc. v. United States*, 33 CIT 125, 136 (2009)

(internal citations omitted); *see also* Uruguay Round Agreements Act, Statement of

Administrative Action ("SAA"), H.R. Doc. No. 103-316, Vol. I at 869 (1994), reprinted in

1994 U.S.C.C.A.N. 4040, 4198–99 (explaining differential use of facts available by

Commerce and the ITC).[17]

   ii.  *Parties' Arguments*

---

[16] In evaluating a Commerce decision to use an adverse inference, the U.S. Court of
Appeals for the Federal Circuit has explained that Commerce determines whether a
respondent has complied to the "best of its ability" by "assessing whether respondent
has put forth its maximum effort to provide Commerce with full and complete answers to
all inquiries in an investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373,
1382 (Fed. Cir. 2003).

[17] The SAA is the authoritative interpretation of the statute.  19 U.S.C. § 3512(d).  The
SAA explains that Commerce generally makes determinations regarding specific
companies; however, "the Commission makes determinations by weighing all of the
available evidence regarding a multiplicity of factors relating to the domestic industry as
a whole and by drawing reasonable inferences from the evidence it finds most
persuasive."  SSA at 869.  Consequently, section 1677e(a) generally allows the
Commission "to reach a determination by making such inferences as the evidence of
record supports even if that evidence is less than complete."  *Id.*

Valeo contends that the Commission erred as a matter of law by failing to apply

an adverse inference against the domestic industry due to a U.S. producer's "careless[]

or reckless[] fail[ure] to cooperate in the Commission's investigation[s] . . . ."  Valeo

Mem. at 10.  According to Valeo, the producer, Novelis, initially withheld all information

related to certain fin stock production, *see id.* at 13, Valeo Reply at 1–2, and submitted

a revised questionnaire response providing (for the first time) information related to

certain fin stock "a mere sixteen days before the Commission's vote," Valeo Reply at 2;

Valeo Mem. at 6, and further revised that response only "nine days before the

Commission's vote," Valeo Mem. at 6.  Due to Novelis' actions, the "Commission's pre-

hearing report, the [parties'] briefs, and hearing were all prepared using incorrect data."

*Id.* at 12.  Moreover, Valeo avers that it was deprived of an opportunity to meaningfully

comment on Novelis' belated submissions.  *Id.* at 13–14; Valeo Reply at 22.

Valeo also argues that Novelis never reported information concerning its fin stock

production facility in Oswego, New York.[18]  It states that, because of this omission, the

Commission relied on "misleading and incomplete" information when evaluating the

"manufacturing facilities, production processes, and employees" factor for its final

determination.[19]  Valeo Mem. at 11–12, 26 & n.2; Valeo Reply at 20–21.  Furthermore,

---

[18] Valeo asserts that it had previously purchased certain fin stock directly from Novelis; thus, "it had firsthand knowledge that Novelis had produced and sold [certain fin stock] during the [period of investigation] and that key data was missing" with respect to the Oswego, New York facility.  Valeo Reply at 3; *see also* Valeo Mem. at 12.

[19] Valeo argued that fin stock requires different production steps, machinery, and equipment from other aluminum foil.  Valeo Posthr'g Br. at 8–10.  It argued that fin stock production requires industry certification, and cannot be produced in non-certified

in its reply, Valeo adds that the record continued to be devoid of information related to Novelis' customers and the origin of the aluminum that Novelis used to make certain fin stock.  Valeo Reply at 4, 17.  Additionally, Valeo complains that the Commission never addressed Valeo's arguments regarding the application of an adverse inference, and avers that "in the absence of any explanation," the court "must remand to the Commission to provide a reviewable determination."  *Id.* at 5.

The Government contends that the Commission was not required to apply an adverse inference against the domestic industry because Novelis complied with the Commission's information requests and cooperated fully throughout the investigations. Gov. Resp. at 23, 25–26.  The Government further contends that the "petitioners provided specific evidence concerning the nature of the production activities at Novelis' Oswego, [New York] facility and highlighted this information in their final comments." Gov. Resp. at 25 (citing Pet'rs' Posthr'g Br. (Feb 15, 2018) ("Aluminum Ass'n Posthr'g Br."), Ex. 10 ¶ 3, Ex. 20 ¶ 7, CR 318, PR 218, CJA Tab 30; Pet'rs' Final Comments (Mar. 13, 2018) at 3 n.1, CR 369, PR 235, CJA Tab 39).  Moreover, Valeo had an opportunity to comment on Novelis' revised questionnaire responses, and the Commission incorporated the revised responses in its final determination.  *See* Gov.

---

plants, which produce other aluminum foil.  *Id.* at 8–9 & n.19; *see also id.*, Ex. 7.  The Commission acknowledged Valeo's arguments but determined that the record was "mixed as to whether certain fin stock is produced on the same equipment, using the same production processes, and the same employees as other in-scope aluminum foil." Final Views at 18 & n.67 (citing Valeo Posthr'g Br. at 1, 8–9); *see also* Final Staff Report at I-33 & n.100 (citing Aluminum Ass'n Postconf. Br., Ex.9) (addressing conflicting evidence).

Resp. at 26–27.  The Government asserts that the Commission cannot apply an

adverse inference against an entire industry.  *See id.* at 24.  The Aluminum Association

similarly argues that the domestic industry, including Novelis, cooperated with the

Commission's investigations and, otherwise, its arguments parallel the Government's

arguments.  *See generally* Aluminum Ass'n Resp.

     *iii.  Analysis*

The Commission's decision not to draw an adverse inference against the

domestic industry is supported by substantial evidence and otherwise in accordance

with law.  Pursuant to the legal standard set forth above, before the Commission may

apply an adverse inference, at least one of the conditions of section 1677e(a) must be

satisfied in order to use the facts available, then the Commission also must find that the

party failed to cooperate to the best of its ability.  *See* 19 U.S.C. § 1677e(a),(b).  The

Commission did not find that any of the conditions of section 1677e(a) were satisfied

such that the use of facts available was appropriate and did not find that Novelis or any

other member of the domestic industry failed to cooperate to the best of its ability.  *See*

*generally* Final Views.

To the contrary, the Commission explained that it was satisfied by the level of

response from the domestic industry, noting that it received questionnaire responses

that accounted for "the vast majority of domestic production of aluminum foil in 2016,"

Final Views at 4, and received "usable financial data on [the U.S. producers'] aluminum

foil operations," Final Staff Report at VI-1.  The level of response received by the

Commission was representative of the domestic "industry" as defined by the statute.

*See* 19 U.S.C. § 1677(4)(A) (defining industry to include "those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product").

The Commission acknowledged that in Novelis' original questionnaire response submitted on December 14, 2017, the company "[[


]]."  Verification Report (Feb. 27, 2018), CR 329, CJA Tab 32; *see also* Final Staff Report at VI-1 & n.2 (referencing the Verification Report); Novelis' Resp. to U.S. Producers' Questionnaire (Dec. 14, 2017), CR 158, CJA Tab 20.  Nevertheless, by February 2018, Novelis "[[

]]."  Verification Report at 5; *see also* Novelis U.S. Producer's Questionnaire Resp. (Revised) (Feb. 27, 2018) ("Novelis Feb. 27th Resp."), CR 328, CJA Tab 31.  The Commission conducted a verification of Novelis during which it received [[

]], Verification Report at 3; *see also id. at* 4 n.1, reviewed [[

]], and determined that "[[


]]," and "the methodologies used [[

]] were deemed reasonable," *id.* at 5.  Moreover, the Commission verified the locations of Novelis' production facilities involved in aluminum foil production, which did

not include the Oswego, New York facility.  *See id.* at 4.  The Commission incorporated

the verification adjustments into the final staff report.  Final Staff Report at VI-1.

While Valeo repeatedly claims that Novelis withheld requested information,

significantly impeded the Commission's investigations, failed the Commission's

verification, and failed to cooperate to the best of its ability, Valeo Mem. at 2, 6, 10, 14;

Valeo Reply at 3, those claims are not supported by the Commission's record.  Valeo's

argument that the Commission erred in failing to apply an adverse inference against the

domestic industry therefore fails because the Commission was not required to make an

adverse inference when no findings pursuant to sections 1677e(a) and (b) had been

made.  *See AWP Indus., Inc. v. United States*, 35 CIT 774, 782 n.25, 783 F. Supp. 2d

1266, 1277 n.25 (2011).

The court is unpersuaded that Valeo did not have a meaningful opportunity to

comment on Novelis' revised questionnaire responses.  *See* Valeo Mem. at 13–14;

Valeo Reply at 22.  Novelis provided the revised responses on February 27 and March

6, 2018.  *See* Novelis Feb. 27th Resp.; Novelis' U.S. Producers' Questionnaire Resp.

(Revised) (Mar. 6, 2018), CR 353, 354, CJA Tab 36.  Pursuant to the scheduling notice

for the final phase of the investigations, on March 9, 2018, the Commission made

available to parties all information on which they did not have an opportunity to

comment.  *See* Scheduling of the Final Phase of Countervailing Duty and Antidumping

Duty Investigations (Nov. 2, 2017) ("Scheduling Notice") at 3, PR 161, CJA Tab 17.  The

parties were permitted to "submit final comments on this information on or before March

13, 2018 . . . ."  *Id.*  Valeo availed itself of the opportunity to submit final comments by

this deadline.  *See* Final Comments on Behalf of Valeo North America Inc. (Mar. 13, 2018), CR 370, PR 231, CJA Tab 38.  In its comments, however, Valeo did not address any of the new information, electing instead to urge the agency to apply an adverse inference against the domestic industry due to Novelis' belated submissions.[20]  *See id.* at 3–5.

Lastly, Valeo is correct that the Commission did not explicitly address Valeo's argument that the Commission should apply an adverse inference.  Valeo Reply at 5; s*ee generally* Final Views.  However, the agency need not respond to every argument made by a party, so long as the path of the agency's reasoning is reasonably discernable by the court.  *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354 (Fed. Cir. 2005); *see also Bowman Transp. V. Ark.-Best Freight Sys.*, 419 U.S. 281, 285–86 (1974) (articulating the discernible path standard).  Here, the Commission explained that it received questionnaire responses accounting for the vast majority of U.S. domestic production of aluminum foil and was able to incorporate Novelis' revised questionnaire responses and verification adjustments into its final determination.  *See* Final Views at 4; Final Staff Report at I-5, VI-1.  Thus, the court finds it was

---

[20] Valeo asserts that it was "constrained by the fact that the statute forecloses the use [of] new factual information to rebut Novelis' submissions."  Valeo Reply at 22 (citing, *inter alia*, 19 C.F.R § 207.30(b)).  Valeo does not identify what information it was prevented from submitting and how that information would have rebutted Novelis' submissions.  *See id.*  It is undisputed that the Commission complied with its statutory and regulatory directives to permit Valeo to comment on Novelis' submissions, *see* 19 U.S.C. § 1677m(g); 19 C.F.R. § 207.30(a), and complied with the scheduling notice established following the Commission's preliminary determinations, *see* Scheduling Notice at 3.  For these reasons, the court finds that Valeo was not deprived of a meaningful opportunity to comment on the new information.

unnecessary for the Commission to reach Valeo's adverse inference argument because

the Commission did not find that there was a gap in the record to be filled with any facts

available, let alone facts available with an adverse inference.

### B. Whether the Commission's Determination is Supported by Substantial Evidence

Valeo challenges the Commission's findings with respect to the following factors:

physical characteristics; manufacturing facilities, production processes and employees;

and distribution channels.[21]  Valeo Mem. at 16–21.  Valeo argues that substantial

evidence does not support the Commission's findings, and the Commission failed to

account for other evidence that contradicts its findings.  *Id.* at 16–21, 22–28.  As

discussed below, the Commission's findings are supported by substantial evidence and

the Commission properly evaluated the record evidence.

---

[21] Valeo does not dispute the Commission's findings with respect to interchangeability, producer and consumer perceptions, and price.  Valeo Mem. at 1.  The Commission found that certain fin stock and other aluminum foil are limited in their interchangeability, that producers and consumers do not perceive them to be comparable, and that the price for certain fin stock is higher.  Final Views at 19–20.  Nevertheless, it concluded that:

> [w]hile the interchangeability between certain fin stock and other aluminum foil is limited, such limited interchangeability is also true for other types of aluminum foil that serve a range of applications.  Although customers perceive certain fin stock and other aluminum foil as different products, the record is unclear as to whether customers perceive certain fin stock and other in-scope fin stock to be different products.

*Id.* at 21.  Valeo argues that those findings are contrary to the Commission's determination of a single like product.  Valeo Reply at 16–17; *see generally* Final Views at 7.

     *Definition of Certain Fin Stock*

     As a preliminary matter, although Valeo does not explicitly challenge the

Commission's reliance on the questionnaire definition of "certain fin stock," it

nevertheless faults the Commission for basing its analysis on a "narrow technical

definition" of the product.  *Id.* at 17; *see also id.* at 20 (arguing that the Commission's

analysis of the channels of distribution factor "was premised on the overly narrow

technical definition of fin stock," and that "no record evidence supports a reasonable

basis on which the Commission relied by narrowly defining fin stock in terms of gauge

and manganese content").  The Commission defined "certain fin stock" as "flat-rolled

aluminum foil of greater than or equal to 45 microns (0.045 mm or 0.00177 inches) and

less than or equal to 200 microns (0.2 mm or 0.00787 inches) in thickness, containing 1

percent or more, by weight, of manganese."  Final Views at 16 n.55 (citation omitted).

"Other in-scope fin stock" consisted of aluminum foil meeting the scope definition and

used as fin stock, but not meeting the definition of "certain fin stock"; therefore, the

Commission's domestic like product analysis was based on a subset of in-scope

aluminum foil used in fin stock applications.  *See id.* at 16–17 & n.60.

     The Commission reasonably based its domestic like product analysis on the

definition of "certain fin stock" included in the questionnaires and the data received in

response thereto.  *See id*. at 16–17.  Pursuant to 19 C.F.R. § 207.20(b), the

Commission is required to "circulate draft questionnaires for the final phase of an

investigation to parties to the investigation for comment."  Once the Commission

complies with that directive, "[a]ny party desiring to comment on draft questionnaires

shall submit such comments in writing to the Commission" and "[a]ll requests for

collecting new information shall be presented at this time."  *Id.*  Consistent with this

regulation, the Commission circulated the draft questionnaires in which it defined fin

stock in accordance with Valeo's initial proposal.  *See* Letter Re: Questionnaire Cmts.;

*Compare* Draft Questionnaire at 2 (defining "[i]n scope fin stock aluminum foil"), *with*

Valeo & MAHLE BT Postconf. Br. at 1 (defining fin stock).  Valeo submitted comments

on the draft questionnaires, agreeing with that definition.  Final Views at 16 & n.55; *see*

*also* Valeo's Draft Questionnaire Cmts. at 3.  Although Valeo proposed changing that

definition after the Commission issued questionnaires to industry participants, the

Commission did not have time to recollect data based on the revised definitions.  Final

Views at 16 n.54.  The court finds no error in the Commission's decision to rely upon the

data collected in response to information requests pertaining to "certain fin stock" as

defined in the questionnaires.  Valeo's arguments attacking the Commission's reliance

on what turned out to be Valeo's own "narrow technical definition of fin stock" are

unavailing.  *See* Valeo Mem. at 17, 20.

_Physical Characteristics and Uses_

Valeo asserts that the Aluminum Association's separate publication of

specification standards for fin stock and aluminum foil renders the Commission's

determination unsupported by substantial evidence.[22]  *See* Valeo Mem. at 16.

---

[22] As the Government observes, this information is more relevant to the producers and
consumers' perceptions factor and the "Commission expressly recognized this, noting
that the record indicated 'producers and customers do not perceive certain fin stock and

Additionally, it asserts that differences in end uses support finding a clear dividing line

between certain fin stock and other aluminum foil.[23]  *Id*. at 17.

The Commission reasonably determined that certain fin stock and aluminum foil

share some physical characteristics.  Final Views at 21.  The Commission explained

that record evidence indicated that certain fin stock overlaps in gauge and in

manganese content with other in-scope aluminum foil used as fin stock.  *Id.* at 16–17 &

n.59 (citing Final Staff Report at Table III-9).  The record showed that U.S. producers

"shipped a substantial quantity of thinner aluminum foil with a manganese content

equivalent to that used in certain fin stock."  *Id.* at 17 & n.61 (citing Final Staff Report

Table III-9).  Additionally, the Commission explained that the alloy series commonly

used in certain fin stock appear also to be used in the production of other aluminum foil.

*Id.* at 17 & n.62 (citing Final Staff Report at I-33).  While the Commission acknowledged

that certain fin stock and other aluminum foil differ in end uses; it observed that there

was no evidence of a similar distinction between certain fin stock and other in-scope fin

stock.  *Id.* at 21.  Again, the Commission explained that varying uses are common when

---

other aluminum foil to be comparable,' and [t]he Aluminum Association separately
categorizes and collects data regarding fin stock and aluminum foil.'"  Gov. Resp. at 31
(quoting Final Views at 19).

[23] Valeo relies on the Commission's observation that "[c]ertain fin stock is used in the
production of fins used in heat exchangers for automotive and HVAC applications,
including air coolers, condensers, evaporators, heater cores, oil coolers and radiators,"
whereas, "thinner aluminum foil is used in a variety of end use applications such as
flexible packaging, containers, and household foil products."  Valeo Mem. at 17 (quoting
Final Views at 17).

a grouping of similar products is involved and there was no evidence that certain fin stock differs in uses from other in-scope fin stock.  *Id*.

Valeo argues that the Commission failed to consider that Aluminum Association standards distinguish fin stock from other aluminum foil based on mechanical properties, including alloy, temper, field strength, elongation, and bow tolerances. Valeo Mem. at 22 (citing Valeo Prehr'g Br. at 9 & Exs. 3, 4).  Contrary to Valeo's assertions, the Commission acknowledged the mechanical properties of certain fin stock, explaining that it "is characterized by higher strength, improved corrosion resistances, increased fatigue strength, enhanced formability, higher thermal conductivity, improved sagging resistance, and improved high temperature properties." Final Views at 16 & n.57 (citing Final Staff Report at I-31).  Nevertheless, certain fin stock overlaps in thickness and in manganese content with other in-scope aluminum foil used as fin stock.  *Id.* at 16–17.  Valeo further contends that the Commission failed to consider evidence "indicating that fin stock is a specialty alloy aluminum that has a significantly different chemical composition from other aluminum foil."  Valeo Mem. at 23.  The Commission considered this evidence, expressly acknowledging that "certain fin stock may be made with proprietary alloys."  Final Views at 16 (citing Final Staff Report at I-31).  In sum, the Commission considered conflicting evidence relating to this factor and its findings as to this factor are supported by substantial evidence.

### *Common Manufacturing Facilities and Production Employees*

Valeo argues that substantial evidence does not support the Commission's finding that "production processes used to produce both [certain fin stock and aluminum

foil] are largely similar."  Valeo Mem. at 18 (quoting Final Views at 21) (alteration in original).  It avers that the Commission reached an unreasonable conclusion when compared to the specific findings it made regarding this factor.  *See id.* at 18.  Valeo argues that the chemical composition of fin stock alloys requires unique manufacturing requirements, which indicates a clear dividing line in production facilities, processes, and employees between fin stock and other aluminum foil.  *Id.* at 18–19.

The Commission noted that "[t]he record is mixed as to whether certain fin stock is produced on the same equipment, using the same production processes, and the same employees as other in-scope aluminum foil*."* Final Views at 18, 21.  Some record evidence indicated that manufacturing facilities for certain fin stock require industry certification and that the production process for certain fin stock includes proprietary processes and a higher level of process controls, such as a 15-step manufacturing process that includes direct chill casting.[24]  Final Views at 18 & nn.66–67 (citing, *inter alia*, Valeo Prehr'g Br. at 17; Valeo Posthr'g Br. at 1, 8–9); Final Staff Report at I-32–33.  Other evidence, however, indicated "that certain fin stock could be produced on the same equipment as other in-scope aluminum foil, *using either the direct chill casting process* or the continuous casting process."  Final Views at 18 n.66 (citing, *inter alia*, Aluminum Ass'n Posthr'g Br. at 4) (emphasis added); *see also* Aluminum Ass'n Prehr'g Br. at 10.

---

[24] Although Valeo contends that the Commission failed to consider this evidence, *see* Valeo Mem. at 25, that contention is belied by the Commission's statements that show the contrary, *see* Final Views at 18; Final Staff Report at I-32–33.

The majority of responding U.S. producers (3 of 5) indicated that certain fin stock and other aluminum foil are fully or mostly comparable with respect to manufacturing facilities and employees while half of the responding U.S. importers (5 of 10) and a majority of U.S. purchasers (11 of 17) indicated that they are fully, mostly, or somewhat comparable in that respect.  Final Views at 18 & n.68 (citing Final Staff Report at Table I-4).  While Valeo contends that a majority of U.S. importers and U.S. purchasers rated certain fin stock as somewhat or not at all comparable with respect to production processes, Valeo Mem. at 24, the difference between Valeo and the Commission is in whether they count the "somewhat" responses with those responding favorably or disfavorably to the comparability question.  Importantly, "when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of the Commission."  *Nippon Steel Corp.*, 458 F.3d at 1358.  The Commission reasonably concluded that "while the manufacturing facilities for certain fin stock and other aluminum foil may themselves be different, the production processes used to produce both products are largely similar."  Final Views at 21.  Additionally, as the Commission observed, "there is nothing on the record that indicates that the production process for other in-scope fin stock differs to a significant degree from that for certain fin stock."  *Id.*  In sum, the Commission's findings as to this factor are supported by substantial evidence.

### Channels of Distribution

Valeo argues that certain fin stock is largely sold to industrial end-users while other aluminum foil is sold to "non-industrial users, including distributor, consumer

packaging, and household users."  Valeo Mem. at 19 (citing Final Staff Report at I-38,

Table I-5).  It contends that the record shows that certain fin stock is shipped "strictly for

use in the specific applications for which it is destined (*i.e.*, heat exchanger/heating,

ventilation, and air conditioning . . .)."  *Id.* at 19–20 (citing Final Staff Report at I-35 Fig.

I-7).  Valeo contends that the Commission failed to address the significance of this

evidence.  *Id.* at 27.

　　　Substantial evidence supports the ITC's finding that there is "overlap in the

channels of distribution between certain fin stock and all other aluminum foil with regard

to end use channels into which they are sold, particularly for shipments for industrial use

and consumer packaging."  Final Views at 18 & n.69.[25]  The Commission noted that all

responding U.S. producers indicated that certain fin stock and other aluminum foil are

either fully, mostly, or somewhat comparable in their channels of distribution, "while a

---

[25] The Commission noted that "more than [[   ]] percent of U.S. producers' [shipments of]
certain fin stock were made to the [[                                ]] channel in each year of
the period of investigation."  Final Views at 18 n.69 (citing Final Staff Report at Table I-
5).  Table I-5 shows that between [[     ]] and [[     ]] percent of U.S. producers'
shipments of certain fin stock and between [[     ]] and [[     ]] percent of U.S.
shipments of all other aluminum foil went to the consumer packaging end use.  Final
Staff Report at Table I-5.  Between [[     ]] and [[     ]] percent of U.S. producers'
shipments of certain fin stock and between [[     ]] and [[     ]] percent of U.S.
producers' shipments of all other aluminum foil went to industrial end uses.  Staff Report
at I-38, Table I-5.  Valeo relies on the statement of one U.S. producer [[
                                                        ]].  Valeo Mem. at 19
(citing Final Staff Report at I-37).  While the Commission acknowledged this fact, it also
noted that [[
                                                        ]].  Final
Staff Report at I-37.  The court will not reweigh the evidence and "the possibility of
drawing two inconsistent conclusions from the evidence does not prevent [the
Commission's] finding from being supported by substantial evidence."  *Matsushita Elec.
Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (citation omitted).

majority of responding U.S. importers (6 of 10) and U.S. purchasers (9 of 15) indicated

that they are fully, mostly, or somewhat comparable." *Id.* at 19 & n.71 (citing Final Staff

Report at I-4).  Additionally, the respondents did not dispute that there is an overlap in

the channels of distribution. *See id.* ("Respondents do not dispute that certain fin stock

and aluminum foil are sold directly to household and industrial end users").

### C.  The Commission Considered the Record as a Whole in Determining that Certain Fin Stock was not a Separate Like Product

Valeo argues that the Commission failed to consider the "totality of the

circumstances" in reaching its determination that record evidence did not indicate a

clear dividing line between certain fin stock and other in-scope aluminum foil products.

Valeo Mem. at 28–29.  It claims that the Commission failed to consider information

regarding distinct end uses, interchangeability, producers and customers' perception,

and price that detract from the Commission's determinations. *Id.* at 29.

The Commission assessed each of the six factors individually, and weighed the

supporting and detracting evidence relating to the factors as a whole. *See* Final Views

at 16–22.  As discussed herein, the Commission considered the evidence and

arguments that Valeo complains the Commission failed to consider.  Valeo's arguments

to the court largely amount to disagreements with the Commission's findings and

attempts to have the court reweigh the evidence.  This the court will not do.

### CONCLUSION

In accordance with the foregoing, Plaintiffs' motions are denied.  Judgment will

be entered accordingly.


/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: September 9, 2019
       New York, New York